## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AXTRIA, INC., JASWINDER CHADHA,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 20-6424** |
| | : | |
| **OKS GROUP, LLC, OKS GROUP INTERNATIONAL PVT. LTD., VINIT KHANNA,** | : | |
| | : | |
| | : | |

## MEMORANDUM

**KEARNEY, J.**                                                **November 15, 2023**

Our constitutional role as impartial arbiters includes resolving disputes among competing businesses hoping to put their disputes behind them. Disputes often resolve through settlement before a judgment. Settlements become complicated when one competing business reports the other business's challenged conduct to the police during the dispute. The police and prosecutor are not before the judge and the businesses cannot bind the police. How does a business obtain finality when the police are separately looking at its conduct alleged in the case? A business can negotiate for a broad release of claims and require the competing business amend its pending police report consistent with the release, but our society has a well-defined and dominant public policy of not enforcing agreements precluding a party from reporting a crime. While we protect parties' freedom to set contract terms including releases, we cannot enforce an agreement allowing allegedly criminally culpable persons to block the ability to report crime.

We today address a business's potential liability for breach of a settlement contract after it filed a criminal complaint referencing the settled dispute almost three years after agreeing to forever discharge complaints against the competing business. We cannot as a matter of law expansively read the release to bar the business from later reporting crimes involving non-parties

which superfluously refer to the earlier released conduct while asking the police to not charge the released competing business consistent with the settlement.   We appreciate the business thought the release from three years ago ended the problems. But the release does not affect police investigations. Our well-defined and dominant public policy of not enforcing promises to not report criminal conduct overwhelmingly outweighs the aggrieved business's right to enforce release language. We grant summary judgment dismissing the four contract claims and leave the competing businesses to resolve the criminal issues outside our jurisdiction.

## I.   Undisputed facts adduced in discovery.[1]

Mortgage servicer BSI Financial Services Inc. outsourced manual aspects of its back-office work to OKS Group LLC beginning in 2006.[2] OKS Group's affiliated entity OKS Group International Pvt. LTD (OKS India) provided back-office services for BSI's offices in India. BSI then hired Axtria India Pvt. LTD (Axtria India) in December 2013 to develop software to automate the manual tasks in India.[3] New Jersey citizen Axtria, Inc. owns Axtria India.[4]

OKS Group and OKS India did not like Axtria India's conduct in working with BSI in India. OKS Group sued New Jersey citizen Axtria in the New Jersey District Court in March 2015.[5] OKS India then sued Axtria India two months later in India.[6] The OKS companies alleged the Axtria entities committed fraud, misappropriated OKS trade secrets and confidential information, interfered with its contracts and prospective economic advantage, and OKS's services unjustly enriched Axtria. OKS also alleged BSI and Axtria India misrepresented Axtria's rate increase business allowing Axtria unprecedented access to OKS's proprietary work processes and Axtria India stole OKS's proprietary information including trade secrets in India. Axtria and Axtria India denied all allegations in both lawsuits. OKS separately sued BSI in the United States courts, arbitration, and in India.

The dispute really heated up over a year later. OKS India through its controlling principal and Chief Executive Officer Vinit Khanna filed a criminal complaint (known as a Protest Petition under India procedure) on August 16, 2016 with the New Delhi Joint Commissioner of Police against Axtria India and its directors Jaswinder Chadha and Manish Mittal, BSI subsidiary Entra Solutions, and persons affiliated with Entra.[7] OKS India, in its Protest Petition, repeated the facts concerning Axtria India's conduct regarding OKS's proprietary information and trade secrets and argued Axtria India's conduct violated Indian criminal law. Axtria and Axtria India denied the criminal allegations. The four entities disputed commercial issues in New Jersey and India civil courts and now faced a criminal review. OKS and BSI also continued litigating civil disputes and reviewing the criminal charges.

### *Axtria and OKS settle.*

True to our judicial role, United States Magistrate Judge Wettre in the District of New Jersey mediated a settlement between Axtria, Axtria India, OKS, and OKS India in April 2017.[8] The parties settled their disputes in New Jersey and in India. They did not address OKS's claims against BSI. The parties confirmed Axtria would pay $25,000 in escrow to be released upon OKS filing of a stipulation of dismissal of the New Jersey case.[9] The parties agreed OKS would take no further action to litigate claims against it in arbitration or in the Indian civil lawsuit.[10] No individual signed the Settlement Agreement in an individual capacity.[11] The Agreement bound only the four entities; the entities did not define the "Parties" as including anyone other than the entities.[12]

The four entities' Agreement signed as of April 13, 2017 included a paragraph 5 addressing future obligations agreeing to "release and forever discharge each other and their respective officers, directors, managers, agents, insurers and employees … individually and in their corporate capacities … from any and all complaints, actions, or causes of actions, in law or equity, arising

under statute or common law, and any suits, debts, liens, contracts, agreements, promises, liabilities, warranties, claims, damages, demands, losses, attorney[']s fees, costs and expenses, whether known or unknown, unforeseen, unanticipated, unsuspected or latent, arising from or relating to the [New Jersey and Indian] Lawsuits at any time prior to the [April 13, 2017] Effective Date."[13]

The four entities' Agreement included a paragraph 6 defining present obligations relating to the "modification of the Indian Lawsuit."[14] The parties agreed OKS India "will alter, amend, or supplement any pending or outstanding civil or criminal complaints in India to effectuate the … agreed release of Axtria … [OKS] will amend, supplement, or dismiss proceedings as necessary to effectuate this release."[15]  The parties agreed to close these obligations by July 1, 2017.[16]

The four entities agreed to bear their own respective attorney's fees in connection with the New Jersey and India lawsuits and in the Agreement.[17] The four entities confirmed the Agreement and documents signed at the same time constituted the full and entire understanding of the agreement between the four entities.[18] The four entities agreed New Jersey law governed their rights and duties.[19] The four entities further agreed a court could invalidate a term of the Agreement (e.g., amendment of the India criminal proceedings) without affecting the enforceability of the remaining obligations in their Agreement.[20]

### OKS India asks India police to withdraw charges against Axtria.

OKS India from November 2017 through early 2018 advised India Police of amending and updating its 2016 criminal complaint to remove charges against Axtria India and its officers.[21] OKS India now told the India Police BSI misled Axtria and Axtria India and the Axtria did not know of the alleged theft of OKS India's proprietary processes. OKS India told India Police it no longer wished to pursue the 2016 criminal complaint against Axtria India and its directors. OKS's

United States counsel timely advised Axtria the India criminal complaint no longer included Axtria.[22] OKS's United States counsel further confirmed India Police assured OKS India Axtria and its employees are not the targets of an India criminal investigation and attached a 2018 revision of the 2016 complaint.[23] The updated criminal complaint (known as a Protest Petition) did not list Axtria, Axtria India, or any of its officers.[24]

***BSI and OKS continued their dispute.***

But BSI and OKS continued to litigate their dispute. BSI and OKS finally agreed to resolve their disputes in July 2018, but OKS did not withdraw the criminal proceeding against BSI. BSI then sued OKS in this District seeking we declare a settlement binding on OKS and for breaching an earlier settlement agreement. BSI and OKS negotiated a second settlement agreement which BSI understood had been resolved by March 10, 2020.[25] OKS claims it did not agree to the second settlement agreement with BSI.

***OKS India renews criminal allegations after March 10, 2020.***

OKS, instead of concluding the BSI settlement agreement on March 10, 2020 when BSI thought it did, quickly moved forward with OKS India amending its criminal complaint in India.[26] OKS India filed an amended criminal complaint by way of a Protest Petition on March 11, 2020.[27] OKS India, through Officer Khanna, alleged facts involving Axtria's agents as part of BSI's alleged misconduct including Axtria India officers Jaswinder Chadha and Minish Mittal.[28] OKS India asked for further investigation of the BSI entity Entra and its directors as well as other persons involved in the alleged criminal conspiracy. It asked for the India court to consider summons upon all persons complicit in the alleged crime. OKS India made clear it did not accuse Axtria India or its agents in this March 11, 2020 amended criminal complaint.

The India Court directed OKS India's March 11, 2020 Protest Petition to the investigating office. The investigating office issued a September 22, 2020 report confirming finding conduct involving Axtria India Officers Chadha and Mittal.[29] The investigating office confirmed OKS India did not file charges against Axtria or its officers Chadha and Mittal and OKS India did not wish to pursue a criminal complaint against Axtria or its agents.[30] But OKS also allegedly told (for purposes of today's review) the India Police the earlier settlement did not bar criminal proceedings and Axtria failed to honor the settlement.[31] The India court (notwithstanding OKS India not seeking charges against them) found enough material on the record to summon the Axtria India officers finding the investigating office cannot as matter of India law decide to not charge simply because of a settlement.[32] India Police began anew investigating charges against BSI, Axtria India, and Axtria officers Chadha and Mittal. Axtria India and Axtria incurred attorney's fees in India and in this lawsuit.[33] Axtria officers are not separately paying attorney's fees.

### *More lawsuits.*

BSI sued OKS in this Court in September 2020 essentially seeking to enforce their understanding of the March 10, 2020 second settlement. The equitable aspects of this dispute seeking declaratory relief are separately before us.

Axtria and its Officer Chadha then sued OKS, OKS India and Officer Khanna before us three months later. Axtria and its Officer Chadha seek damages alleging the OKS entities and Officer Khanna breached the April 13, 2017 Agreement even though neither Officer Chadha nor Officer Khanna signed the Agreement. Axtria also seeks damages for breach of an implied covenant of good faith and fair dealing, promissory estoppel, and to recover the amount of money OKS, OKS India, and Officer Khanna have been unjustly enriched by Axtria's conduct. The parties engaged in discovery preparing for a mid-November 2023 trial.

## II.   Analysis

OKS, OKS India, and its Officer Khanna moved for summary judgment arguing they cannot be liable for allegedly cooperating with the India Police, cannot be responsible for attorney's fees, and Axtria is not entitled to punitive damages. Axtria and its Officer Chadha oppose OKS's motion arguing public policy does not invalidate an agreement prohibiting filing amended criminal charges, OKS relies on inapposite authority, and dismissing their four contract claims would violate principals of international comity.

We examined the record upon transfer to our docket a few months ago. We held extensive oral argument. The parties agreed the terms of the Agreement are not ambiguous. We specifically pressed in oral argument as to whether filing the March 11, 2020 amended Protest Petition in India could constitute a "complaint" or "action" which OKS agreed to forever discharge in the same Agreement which specifically defined the steps necessary to be taken in India to amend the pending Protest Petition. We are left with a negotiated agreement requiring OKS entities to forever discharge the Axtria entities from a complaint (paragraph 5 of the Agreement) and a separate obligation for OKS India to alter, amend, or supplement the then-pending Protest Petition (paragraph 6 of the Agreement).

We first clear the brush of several issues. We find no basis to impose liability on non-signatories to the settlement agreement between four entities. The individual officers cannot enforce nor be liable on the Agreement. There is no allegation or evidence of third-party beneficiary or alter ego allowing us to cavalierly grant rights or pierce the entities' corporate protections to impose contract obligations on officers. We dismiss Officer Chadha's claims for damages as he lacks standing particularly as he has not paid attorney fees nor pleaded a claim for

non-economic harm. We dismiss claims against Officer Khanna as he did not agree to the terms and is not sued as an alter ego.

We are then left with whether OKS or OKS India can be liable as a matter of law (since the material facts are not disputed) for breaching the integrated Agreement when OKS India amended a Protest Petition mentioning but not charging Axtria India almost three years after agreeing it would forever discharge Axtria from complaints. The issue is complicated by the next paragraph in the integrated Agreement defining how OKS India would address the pending criminal complaint/Protest Petition. The entities required OKS India to alter, amend, or supplement the pending criminal complaint/Protest Petition to effectuate the agreed release in the immediately preceding paragraph. OKS India did exactly as OKS agreed. It withdrew claims against Axtria India and disavowed its earlier allegations. It confirmed the India Police did not intend to pursue Axtria. But it then admittedly advised the Indian Police of renewed claims against BSI on March 11, 2020 while including identified conduct by Axtria. OKS India told the India Police it did not seek charges against Axtria. The India Police still opened the investigation requiring Axtria to defend itself and its India manager.

Axtria's counsel repeatedly confirmed its alleged breach theory is limited to OKS India filing the March 11, 2020 amended Protest Petition seeking to prosecute BSI. The issue is whether OKS India's amended March 11, 2020 Protest Petition breached OKS's obligation in paragraph 5 of the Agreement to forever discharge a complaint based on the same allegations.

### A.    Axtria Officer Chadha lacks standing to sue for breach of contract.

Axtria Officer Chadha sues seeking attorney's fees he did not pay seeking to enforce the Agreement he did not sign. He did not argue, and we have no basis to find, a right to recover based on a third-party beneficiary theory. He lacks standing.[34]

**B.     OKS Officer Khanna cannot be liable for breaching the Agreement.**

Axtria claims OKS Officer Khanna breached the Agreement by filing the March 11, 2020 amended Protest Petition based on either the obligations set in paragraph 5 (the release) or in paragraph 6 (modify pending Protest Petition) of the Agreement.

But OKS Officer Khanna did not sign the Agreement. He made no representations in the Agreement. He did not agree to engage in conduct or refrain from conduct. The four signatory entities agreed to define the "Parties" to their obligations as Axtria, Axtria India, OKS, and OKS India. The entities did not include language extending these obligations to non-signatories. There is no basis to impose contract liability upon OKS Officer Khanna. Axtria did not plead or argue Officer Khanna can be liable as an alter ego or based on piercing the OKS corporate veil.

Axtria did not adduce evidence allowing us to find genuine issues of material fact as whether Officer Khanna breached the Agreement through OKS India's filing of the March 11, 2020 amended Protest Petition.

**C.   Axtria does not adduce evidence OKS Group or OKS India breached the obligation to modify the pending Protest Petition.**

The four entities agreed in paragraph 6 of the Agreement to govern their future relationship by, among other obligations, requiring OKS India modify the pending Protest Petition in India to effect the release and remove Axtria from criminal jeopardy. Axtria does not adduce evidence of an agreement to not file an amended Protest Petition not ever accusing Axtria India. Axtria agreed as to the terms. It has not adduced evidence OKS India did anything different than it agreed to do in paragraph 6 of the Agreement.

Axtria had the ability to contract as it wished through sophisticated counsel. OKS, also represented by sophisticated counsel, then directed conduct in accord with the parties' integrated Agreement. The parties do not dispute OKS advised the Indian authorities of no further claims

9

against Axtria India arising from the earlier conduct. OKS India twice advised the India Police it was not accusing Axtria India, or its officials, of conduct sought to be charged. OKS India specifically recanted the involvement of Axtria India in the earlier allegations. Axtria offers no basis for us to find the March 11, 2020 Protest Petition breached this portion of the April 10, 2017 Agreement. OKS India is not seeking damages and has not brought a complaint, action, or cause of action in law or equity arising under statute or common law seeking recovery. OKS India's Protest Petition specifically told the India Police it is not accusing Messrs. Chadha or Mittal because of a settlement. OKS India amended consistent with the Agreement.

Axtria did not adduce a fact allowing us to find OKS India did anything to breach the obligations in paragraph 6 of the Agreement to alter, amend, or supplement the pending criminal complaint in India to effectuate the agreed release. It did so. We are mindful OKS India carefully avoided asking for charges against Axtria India and its agents in the March 11, 2020 amended Protest Petition. It played close to the line. We appreciate Axtria feels deceived, but it did not include language in the integrated Agreement precluding further fact allegations (assuming it could do so consistent with public policy). Axtria instead required specific conduct to alter, amend, or supplement the pending criminal complaint. OKS India met this obligation imposed by the parties and confirmed in paragraph 6 of the Agreement.

We dismiss contract claims based on paragraph 6 as a matter of undisputed fact.

### D.  We cannot grant judgment as a matter of contract interpretation on the release absent fact finding on the expected effect of an amended Protest Petition.

The question then becomes whether OKS and OKS India breached the release language in paragraph 5 of the Agreement by submitting the March 11, 2020 amended Protest Petition.  The four entities agreed to forever discharge each other and their officers from complaints, actions, or

causes of actions in law or equity raised under statute or common law arising from or related to the claims then pending in the two lawsuits in New Jersey and in India.

We interpret the release in paragraph 5 of the Agreement in accord with its plain terms. The entities agree we must interpret the Agreement under New Jersey law. We interpret the Agreement according to its terms. A basic tenet of New Jersey law is the doctrine of freedom to contract.[35]

We would need to understand the effect of the arguably superfluous allegations in the March 11, 2020 Protest Petition may have on a criminal investigation intended to focus on BSI. We would need to understand whether OKS India telling the India Police it is not specifically seeking to charge Axtria because of settlement nevertheless results in a de facto complaint under the release language. OKS played it right up against the line. It has taken apparently contrary fact positions in India. And we trust the India Police will fairly evaluate the changed fact recitals. We understand why Axtria's counsel suggested it would not be in litigation today if OKS India did not so liberally throw facts at Axtria in the March 11, 2020 amended Protest Petition and instead focused entirely on BSI's alleged conduct.

But finding fact issues on how OKS India's chosen and possibly superfluous language in the March 11, 2020 amended Protest Petition may nevertheless be a de facto complaint is not the end of our analysis. OKS and OKS India argue the release even as interpreted by Axtria is not enforceable as a matter of law.

### E.  We cannot enforce a promise to not report criminal activity.

We must next address whether we can, as a matter of public policy, enforce a freely negotiated contract obligation to not report criminal conduct as Axtria suggests OKS India did regarding Axtria in the March 11, 2020 amended Protest Petition. We cannot enforce the release

in the manner Axtria suggests and allow it to recover attorney's fees for defending itself as a matter of New Jersey contract law.

We do not lightly interfere with the freedom of contract, but this freedom is not absolute.[36] Courts including those applying New Jersey law historically refuse to enforce contracts violating public policy, including contracts violating statutes, promoting crime, and interfering with the administration of justice.[37]

We cannot proceed on contract claims violating New Jersey public policy. We cannot find OKS or OKS India breached a patently unenforceable obligation, at least as Axtria interprets it, precluding OKS India from reporting criminal conduct by other persons while admittedly referencing Axtria but not seeking to bring charges against it. The parties correctly evaluate the present status of governing New Jersey law as not directly addressing this issue in the context of a contract which requires parties to alter, amend, or supplement criminal complaints they filed in a foreign country in connection with a release.

New Jersey courts apply Section 178 of the Restatement (Second) of Contracts "to determine whether a contractual provision is void as against public policy" where the "public policy is weighed against the enforcement of the contractual provision."[38] Section 178 provides a balancing test to determine whether a contractual term is unenforceable on public policy grounds: "[a] promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."[39]

In weighing the interest in the enforcement of a term, Section 178(2) directs us to consider "(a) the parties' justified expectations, (b) any forfeiture that would result if enforcement were denied, and (c) any special public interest in the enforcement of the particular term."[40] In weighing

the public policy against enforcement of a term, Section 178(3) directs us to consider "(a) the strength of that policy as manifested by legislation or judicial decisions, (b) the likelihood that a refusal to enforce the term will further that policy, (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and (d) the directness of the connection between that misconduct and the term."[41]

We addressed the analysis detailed by the trial and appellate courts in *Saxon Construction* during oral argument. The United States Veterans Administration awarded a contract to general contractor Saxon to renovate four hospitals.[42] Saxon contracted with subcontractor Masterclean to remove asbestos in the four hospitals. Masterclean completed its work on two of the four buildings but failed to begin work on the third building. Saxon sued Masterclean for breach of contract but mitigated its damages by hiring another subcontractor to do the work at lower cost. Masterclean counterclaimed against Saxon seeking the difference between what Saxon paid the new subcontractor and what Saxon would have paid Masterclean if it performed the contracted work. Masterclean relied on a contract clause providing "[i]f the unpaid balance of the contract sum exceeds the expense of finishing the work, such excess shall be paid to [Masterclean], but if such expense exceeds such unpaid balance, [Masterclean] shall pay the difference to [Saxon]."[43]

Judge Arnold rejected Masterclean's contract counterclaim after applying Section 178 of the Restatement. Judge Arnold reasoned the contract discouraged Masterclean from performing the contract and would allow Masterclean to profit from its breach of the contract, encourage general contractors faced with a breach by a subcontractor not to mitigate damages causing waste, and is inconsistent with "fair and honorable dealing because it permits a culpable party to be unjustly enriched at the expense of an innocent party."[44]

The New Jersey Superior Court Appellate Division affirmed Judge Arnold's finding the contractual term violated public policy.[45] The Appellate Division confirmed long-standing New Jersey jurisprudence declining to enforce contracts violating statutes, promoting crime, and interfering with the administration of justice.[46] The court explained public policy "eludes precise definition and may have diverse meanings in different contacts," and is based on federal and state legislation and judicial decisions.[47] The doctrinal concerns protecting public rights is "flexib[le] in its application" and will be applied where enforcement of a contractual promise is outweighed by a public policy harmed by enforcement of it.[48]

Applying the factors in Restatement section 178, we conclude enforcing the release language in paragraph 5 of the Agreement in the manner advocated by Axtria is void as against public policy.  The four entities agreed to "release and forever discharge each other and their respective officers, directors, managers, agents, insurers and employees … individually and in their corporate capacities … from any and all complaints, actions, or causes of actions, in law or equity, arising under statute or common law, and any suits, debts, liens, contracts, agreements, promises, liabilities, warranties, claims, damages, demands, losses, attorney[']s fees, costs and expenses, whether known or unknown, unforeseen, unanticipated, unsuspected or latent, arising from or relating to the [New Jersey and Indian] Lawsuits  at any time prior to the [April 13, 2017] Effective Date."[49] We do not read New Jersey law as to allow us to enforce a promise to not report a suspected crime.

For example, in *Dong Ho Lee v. Eun Kyung Park*, the New Jersey appeals court held a contractual agreement to operate a restaurant and serve alcohol with a borrowed liquor license contrary to New Jersey statute is void as against public policy.[50] In *Woodson v. Runyon*, Judge Bumb applying New Jersey law concluded an agreement intending to bar a potential witness from

testifying in a criminal proceeding is void as against public policy.[51] In *Woodson*, two men, Mr. Woodson and Mr. Runyon entered into an agreement whereby Mr. Runyon agreed not to testify against Mr. Woodson in a criminal matter. Mr. Woodson sued Mr. Runyon for breach of the agreement after Mr. Runyon testified against Mr. Woodson before a grand jury. Judge Bumb reasoned the agreement is void as against public policy as obstructing and impairing the administration of justice and for an improper purpose.[52]

Given the understandably limited judicial scrutiny in New Jersey law to date of promises to not report criminal conduct, we are further guided by persuasive reasoning from several other courts. Our nation has long recognized a citizen's duty to report felonies to authorities, as recognized by the Supreme Court forty-three years ago in *Roberts v. United States*.[53] This recognition is based on Anglo-Saxon law dating at least as early as the 13th century.[54] In 1790, the first Congress of the United States enacted a law imposing criminal penalties on anyone who "having knowledge of the actual commission of [certain felonies,] shall conceal, and not as soon as may be disclose and make known the same to [the appropriate] authority."[55]

We are persuaded by the United States Court of Appeals for the Federal Circuit's analysis in *Fomby-Denson v. Dept. of Army*.[56] The Court of Appeals considered whether a settlement agreement bars the United States from making criminal referrals of a federal employee's conduct underlying the settlement. The United States Army hired Ms. Fomby-Denson, a United States citizen, as an Army Family Advocacy Program Coordinator at an Army base in Germany. The base's case review committee determined Ms. Fomby-Denson responsible for child neglect and reassigned her to duties unrelated to the Family Program. The Army notified Ms. Fomby-Denson of a proposed removal from her position, later amending the notice to include an additional charge arising from her alleged forgery of a document extending her authorized stay in Germany. Ms.

Fomby-Denson appealed her termination and filed a complaint with the Equal Employment Opportunity Commission. She entered into a settlement agreement in which the Army agreed to cancel her termination, place her on leave without pay, and pay her a lump sum in return for her withdrawing her appeal and EEOC complaints and voluntarily resigning. After the parties signed the settlement agreement, counsel for the Army referred allegations of Ms. Fomby-Denson's forgery to local German law enforcement for investigation and possible prosecution. Ms. Fomby-Denson then sued the Army for breach of the settlement agreement.

The Court of Appeals for the Federal Circuit held construction of the settlement agreement to bar the Army from referring a criminal action to the German authorities is against public policy. The Court of Appeals extensively analyzed the status of general contract law precluding us from enforcing contracts contrary to public policy. The Court of Appeals cited several Supreme Court precedents now extending well over one hundred years recognizing a court should decline to enforce a private contract when public policy demands enforcement should be denied without regard to interests of the individual parties particularly when enforcement is contrary to public policy of the United States.[57]

Before we find a contract unenforceable on public policy grounds, we are directed first to look at whether the public policy at issue is "well defined and dominant."[58] The determination is "to be made by reference to the laws and legal precedents and not from general considerations of supposed public interests."[59] The Court of Appeals, relying on the Supreme Court's decision in *Roberts*, examined the long history of the public policy interest of reporting possible crimes to authorities is one of the highest order and "indisputably" well defined and dominant in a jurisprudence of contract law.[60] The Court of Appeals cited long-standing examples of state courts declining to enforce private agreements barring the reporting or prosecution of possibly crimes

even where the criminal action would occur in a jurisdiction other than the jurisdiction where the contract is enforced.[61] For example, the Court of Appeals cited the Texas Supreme Court's analysis in *Lewkowicz v. El Paso Apparel Corp.* where an employer filed criminal charges against its employees in Mexico, later settled where the employer agreed to dismiss the charges.[62] The Texas Supreme Court declined to enforce the parties' agreement even though it may have been valid under Mexican law because "[a] contract made in consideration of compounding a criminal offense is void" in contravention of Texas public policy.[63]

 The Court of Appeals for the Federal Circuit supported its reasoning with references to the Restatement of Contracts and Professor Corbin's direct guidance: "[a] bargain the purpose of which is the stifling of a prosecution is in all cases contrary to public policy and illegal even though it may not itself be a crime. This is true even though the prosecution in question is for a mere misdemeanor; and it is true whether the prosecution has or has not been started at the time the bargain is made. Bargains of this kind are in various forms, including promises not to prosecute or not to give evidence to the prosecuting officers."[64] The Court of Appeals distinguished and recognized the possibility of various comity concerns and found "of course appropriate" for the Army "to provide all details reasonably thought necessary for those authorities to make their decisions regarding the investigation and possible prosecution of Ms. Fomby-Denson."[65]

 We are also guided by Judge Robreno's more recent analysis of similar issues under Pennsylvania law in *Cosby v. American Media, Inc.*[66] Judge Robreno addressed motions to dismiss a breach of a settlement agreement claim brought by celebrity Bill Cosby against various parties to a settlement agreement. An individual suing Mr. Cosby for misconduct signed a confidential settlement agreement including a promise "not to disclose to anyone, via written or oral communication or by disclosing a document, in private or public, any aspects of [the litigation,"

"the events or allegations upon which the [litigation] was based," and "allegations made about [Mr. Cosby] or [Andrea Constand] by other persons."[67] Nearly ten years after signing the settlement agreement, some of the parties to the settlement agreement began commenting on social media and to news outlets regarding allegations of sexual assault.

Mr. Cosby sued for breach of contract and unjust enrichment, including an allegation two of his accusers and parties to the settlement agreement breached the agreement by voluntarily cooperating with law enforcement agents conducting a criminal investigation into Mr. Cosby's conduct.[68] The individuals moved to dismiss arguing the provision of the contract Mr. Cosby alleged they breached is unenforceable because it violates public policy.[69]

Judge Robreno first examined whether the public policy at issue is well defined and dominant.[70] Relying on the Court of Appeals's reasoning in *Fomby-Denson*, Judge Robreno concluded a promise to not disclose information about crimes to law enforcement authorities is unenforceable as against public policy.[71] Judge Robreno rejected Mr. Cosby's argument *Fomby-Denson* does not apply to voluntary disclosures to law enforcement and applied only to disclosures elicited through a subpoena.[72] Judge Robreno reasoned *Fomby-Denson* involved a voluntary disclosure and the public policy reasons underlying in *Fomby-Denson* apply equally to voluntary as to forced disclosures.[73] Judge Robreno dismissed Mr. Cosby's breach of contract claims based on an allegation of disclosures to law enforcement officials.

We are also persuaded by the Illinois Court of Appeals's analysis based on similar facts in *Signapori v. Jagaria*.[74] In *Signapori*, two shareholders of two corporations wanted to borrow money to purchase hotels. They allegedly submitted loan applications with false information. They then began disputing issues resulting in delaying their ability to obtain financing. The two shareholders agreed to resolve their differences through a settlement agreement containing two

key provisions: one agreeing to fully cooperate with each other to obtain financing for the hotel purchase deal and the other agreeing to a confidentiality clause barring disclosure the terms of their agreement "for any reason to any person or entity."[75] After signing the agreement, one of the men became involved in litigation in India during which he submitted an affidavit to an Indian court disclosing the contents of the parties' agreement, including issues on the false statements on loan applications.[76] The other shareholder sued alleging a breach of the confidentiality provision of the settlement agreement.

The trial court dismissed the breach of contract claim finding the confidentiality provision violated public policy. The Illinois Court of Appeals affirmed, finding public policy "favors the exposure of crime, and the cooperation of citizens possessing knowledge thereof is essential to effective implementation of that policy" and individuals "acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by fear of unfounded suits by those accused."[77] Citing the Supreme Court in *Roberts v. United States*, the Illinois Court of Appeals recognized the long-standing history condemning the concealment of crime and "agreements to conceal information relevant to the commission of crime have very little to recommend them from the standpoint of public policy."[78] The court relied on a different section of the Restatement of Contracts, section 548(a), providing "[a] bargain in which either a promised performance or the consideration for a promise is concealing or compounding a crime or alleged criminal is illegal."[79] The court concluded the parties entered the agreement to defraud financial institutions contrary to law and against public policy and determined it would not enforce a contract purporting to bar one party from reporting another party's alleged misconduct.[80]

Axtria argues neither *Cosby* nor *Fomby-Denson* offer fair guidance particularly since we are guided by New Jersey law because of a breach of the settlement agreement is governed by New

Jersey law. Axtria offers a decision from the New Jersey Supreme Court, *In the Matter of Stein*, to support its argument a settlement agreement including the dismissal of criminal charges is appropriate under New Jersey law as long as the complainant informed law enforcement authorities of the nature of the charges and settlement between the parties.[81] *In the Matter of Stein* does not support Axtria's argument.

In *Stein*, the New Jersey Disciplinary Review Board recommended Attorney Stein be suspended from the practice of law based on alleged ethics violations in his representation of clients and improper handling of trust funds. In one alleged ethics violation, Attorney Stein represented a defendant in a criminal sexual assault case. Attorney Stein advised the victim complainant to retain an attorney and have the attorney contact him to discuss a possible civil settlement of the case.[82] The victim retained counsel and told Attorney Stein she wished to withdraw the criminal complaint. The victim's attorney advised her to obtain a release from the defendant because of the potential for a malicious prosecution charge if she discontinued her complaint and discussed a possible civil settlement. The victim's attorney conveyed the demand to Attorney Stein and the parties agreed on a settlement amount.[83] The victim appeared in municipal court and informed the court she wished to withdraw the criminal complaint, but did not mention the civil settlement. Attorney Stein, present in court, did not disclose to the court the civil settlement. The municipal court dismissed the criminal charge subject to the approval of the county prosecutor.[84] The victim then signed a release waiving "all rights and claims, both civil and criminal" against defendant.[85]

The county prosecutor's office later learned of the civil settlement. The prosecutor's office filed a formal ethics complaint against Attorney Stein for failing to disclose the settlement. The New Jersey Disciplinary Board concluded Attorney Stein violated the ethics code by failing to

inform the municipal court of a civil settlement between the victim and the defendant.[86] It concluded, under New Jersey law, if an attorney wishes to have complaints dismissed, he must first go before the prosecutor and judge and make a full and open disclosure of the nature of the charges and terms under which the dismissal is sought and an attorney may not consent to a dismissal unless both the judge and the prosecutor are satisfied the public interests, as well as the private interests of the complainant, will be protected.[87]

We do not see how *In the Matter of Stein* is relevant or supportive of Axtria's argument an agreement waiving criminal action does not violate public policy. First, the issue in *Stein* is the attorney's ethical breaches by failing to advise the court and prosecution of the civil settlement, not a contractual issue. Second, under New Jersey law a civil settlement ***may not*** be entered into during a pending criminal action unless the court and the prosecutor agree the terms satisfy public interests and the interests of the victim. This principle at least suggests the court and/or the prosecutor may disagree with the civil settlement as against public interests notwithstanding the victim's release of criminal charges. Nothing in the court's analysis in *In the Matter of Stein* undercuts New Jersey law finding unenforceable provisions void as against public policy.

We weighed Axtria's interest in enforcing its interpretation of the release in paragraph 5 of the Agreement against the well-defined and dominant public policy consistent with guidance from the Restatement as applied by our colleagues in several contexts.  We find no basis the four entities intended to preclude OKS India's future involvement in the pending Protest Petition in all aspects. The parties agreed OKS India would amend or supplement to affect the presently pending Petition. But the parties tellingly did not address what, if anything, OKS India could do relative to its ongoing charge against BSI in the same Protest Petition.  Axtria could not now justify an expectation OKS India would not be involved in reporting to India authorities moving forward.

Axtria did not negotiate for this expectation.  We cannot craft this expectation to overcome the well-defined and dominant public policy.  We are also not persuaded by the forfeiture of rights in not enforcing this alleged promise.  Axtria then, and now, can defend itself in the India courts. And we can find no special public interest supporting enforcing an agreement which (according to Axtria's interpretation) would allow parties to agree not to report criminal activity.   This well-defined and dominant policy is confirmed by centuries of Anglo-Saxon law detailed by the Supreme Court forty-three years ago in *Roberts.*  These competing businesses and their attorneys know, or should know, of this well-defined and dominant public policy. Disregarding this well-defined and dominant public policy to promote Axtria's theory of the release language lacks a fact or legal basis. The alleged criminal misconduct appears to be serious and continues to proceed through investigation in India. OKS India's March 11, 2020 report did not deliberately breach its obligations; it expressly told the India Police of not seeking charges against Axtria India and its agents. We agree with Axtria of a connection between the release (as it interprets the language) and the charged misconduct. But the integrated release language focuses on complaints and does not address future references to the Police even though Axtria knew of the ongoing criminal proceeding with BSI.

Axtria asks us to enforce its interpretation of the release to promote freedom of contract terms over a well-defined and dominant public policy precluding us from enforcing promises to not report criminal conduct to the police. We balanced the factors offered in reasoned decisions for decades. The factors overwhelmingly require we do not enforce the release in the manner suggested by Axtria by way of enforcing a written or implied promise.[88]

We grant OKS and OKS India summary judgment on Axtria's claims.

### F.  We are not persuaded by Axtria's comity concerns.

We are mindful the alleged conduct occurred in India by citizens of India.  The India citizens chose New Jersey law.  No party suggests undue influence or other disability requiring we ignore integrated contract language as to choice of law.

Axtria suggests not enforcing its interpretation of the release in the Agreement offends international comity given respect for its efforts under India criminal process. Nothing in our reasoning is directed towards India criminal process. We are focused solely on the governing law chosen by Axtria in the Agreement. The parties are entitled to pursue good faith arguments under India law with the India courts. But our review of the well-defined and dominant public policy under the parties' chosen governing law is not altered by arguments Axtria makes before India courts. We are not affecting India law or India jurisprudence.

### III.    Conclusion

Axtria signed a settlement agreement negotiated by sophisticated counsel which confirmed definite terms as to the parties' future relationship. It required Axtria to pay $25,000 in exchange for releases and for OKS India to alter, amend or supplement the pending criminal complaint in India. OKS India meet this obligation. OKS India and OKS also agreed to forever discharge Axtria and Axtria India as well as its officers from complaints, actions, or causes of actions within its control arising under statute or common law on any issues arising from or related to the claims in the two civil lawsuits. OKS India and its officers specifically advised the Indian authorities they were not seeking to accuse the Axtria agents in the amended Protest Petition.

We grant summary judgment to OKS Group, OKS India, and its Officer Khanna. We agree with OKS Group but for slightly different reasons for the four contract claims. Officer Chadha and Officer Khanna did not sign the Agreement, the entities did not define them as a Party subject to

23

the Agreement, and there is no basis at law to allow Officer Chadha to proceed on a contract theory or to hold Officer Khanna liable for an entity's alleged breach of a contract he did not sign in his individual capacity. We also cannot find OKS Group or OKS India breached the negotiated terms of the Agreement. We find no basis OKS India breached its specific obligations under paragraph 6 of the Agreement. OKS India completed each required step.

We decline to enforce the release in the manner suggested by Axtria's interpretation. Enforcing the release to the extent requested by Axtria is contrary to New Jersey's well defined and dominant public policy. Axtria cannot enforce the release in the manner it seeks.

---

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts ("SUMF") and an appendix to support summary judgment. Defendants OKS Group, LLC, OKS Group International Pvt. Ltd., and Vinit Khanna (collectively "OKS") filed its Motion for summary judgment, brief in support of summary judgment, SUMF, and Appendix ("Appx.") at ECF Nos. 71 through 71–5. Plaintiffs Axtria, Inc. and Jaswinder Chadha (collectively "Axtria") filed its response at ECF No. 72 through 72–3.

[2] ECF No. 62, Amended Complaint ¶ 15.

[3] *Id.* ¶ 17.

[4] *Id.* ¶ 1.

[5] ECF No. 72–1, Axtria Response to SUMF ¶ 2.

[6] *Id.* ¶ 4.

[7] *Id.* ¶ 5.

[8] ECF No. 62, Amended Complaint ¶ 26.

[9] ECF No. 72–2, Axtria Counter SUMF ¶ 7.

[10] ECF No. 72–1, Axtria Response to SUMF ¶¶ 6, 7.

[11] ECF No. 72–3, Appx 35a–40a.

[12] *Id.*

[13] *Id.*, Appx. 36a, ¶ 5.

[14] *Id.*, Appx. 37a ¶ 6.

[15] *Id.*

[16] *Id.*, Appx. 36a ¶ 4.

[17] *Id.*, Appx. 37a ¶ 7.

[18] *Id.* ¶ 11.

[19] *Id.*, Appx. 38a ¶ 16.

[20] *Id.* ¶ 18.

[21] ECF No. 72–1, Axtria Response to SUMF ¶ 8.

[22] *Id.* ¶ 9.

[23] *Id.* ¶ 10.

[24] ECF No. 72–2, Axtria Counter SUMF ¶ 18.

[25] ECF No. 72–1, Axtria Response to SUMF ¶ 11.

[26] ECF No. 72–2, Axtria Counter SUMF ¶¶ 20–23.

[27] *Id.*

[28] ECF No. 72–1, Axtria Response to SUMF ¶¶11–12.

[29] *Id.* ¶ 13.

[30] ECF No. 71-3, Appx. 115a.

[31] *Id.*

[32] ECF No. 72–2, Axtria Counter SUMF ¶¶ 29–34.

[33] *Id.*

[34] *Lutter v. JNESO*, --- F. 4th ---, No. 21-2205, 2023 WL 7291378 (3d Cir. Nov. 6, 2023) (Article III standing requires (1) an injury in-fact; (2) fairly traceable to the conduct of the party sued; and (3) is judicially redressable).

[35] *Marcinczyk v. State of N.J. Police Training Comm.,* 5 A.3d 785, 788–89 (N.J. 2010).

[36] *Black Ship, LLC v. Heartland Payment Sys., LLC,* No. 21-13855, 2023 WL 3585329, at *6 (D.N.J. May 22, 2023), *appeal filed* (3d Cir. June 12, 2023).

[37] *Id.*; *Saxon Const. & Mgmt. Corp. v. Masterclean of N.C., Inc.,* 641 A.2d 1129, 1131 (N.J. Super. Ct. Law Div. 1992), *aff'd,* 641 A.2d 1056 (N.J. Super. Ct. App. Div. 1994).

[38] *Alston v. City of Hoboken*, No. A-2677-17T2, 2020 WL 3968080, at *5 (N.J. Super. Ct. App. Div. July 14, 2020). *See also Woodson v. Runyon*, No. 13-4098, 2013 WL 3514421, at *3 n. 9 (D.N.J. July 11, 2013) (applying section 178 to contract intended to bar a potential witness from testifying at a criminal proceeding as void); *Town of Secaucus v. City of Jersey City,* 20 N.J. Tax 562, 570–71 (N.J. Tax Ct. 2003) (applying section 178 to settlement agreement where a municipality agreed not to sue a development company over assessments to property as against public policy); *Saxon Construction,* 641 A.2d at 1058–59 (applying section 178 to termination clause in contract as void as against public policy).

[39] RESTATEMENT (SECOND) OF CONTRACTS § 178(1) (1981).

[40] *Id.* at § 178(2).

[41] *Id.* at § 178(3).

[42] *Saxon Construction*, 641 A.2d at 1130.

[43] *Id.*

[44] *Id.* at 1131.

[45] *Saxon Construction*, 641 A.2d at 1057.

[46] *Id.* at 1058–59.

[47] *Id.* (cleaned up).

[48] *Id.* at 1059 (quoting *Town of Newton v. Rumery,* 480 U.S. 386, 392 (1987)).

[49] ECF No. 62-3 ¶ 5.

[50] *Dong Ho Lee v. Eun Kyung Park*, No. A-2273–12T2, 2015 WL 2458012 (N.J. Super. Ct. App. Div. May 27, 2015).

[51] *Woodson*, 2013 WL 3514421 at *3.

[52] *Id.* (collecting cases) and n. 9.

53 445 U.S. 552 (1980).

54 *Id*. at 557–58.

55 *Id.* at 558.

56 247 F.3d 1366 (Fed. Cir. 2001).

57 *Id.* at 1373–74 (collecting cases).

58 *Id.* at 1375.

59 *Id.* (cleaned up).

60 *Id.*

61 *Id.* at 1376.

62 *Id.* (citing *Lewkowicz v. El Paso Apparel Corp.*, 625 S.W.2d 301 (Tex. 1981)).

63 *Id.* (citing *Lewkowicz,* 625 S.W.2d at 302-03). The Court of Appeals analyzed similar cases from Alabama, Michigan and Massachusetts all finding contracts based on a private agreement to refrain from reporting a criminal charge is unenforceable as against public policy. *Id.* at 1376–77.

64 *Id.* at 1377 (citing 6A Arthur L. Corbin, *Corbin on Contracts* § 1421 at 355–56 (1962)) (footnote omitted).

65 *Id.* at 1378.

66 197 F. Supp. 3d. 735 (E.D. Pa. 2016).

67 *Id.*at 740–41.

68 *Id.* at 740–42.

69 *Id.* at 741.

70 *Id.*

71 *Id.* at 742.

72 *Id.*

73 *Id.*

74 84 N.E. 3d 369 (Ill. App. Ct. 2017).

[75] *Id.* at 372.

[76] *Id.* at 373.

[77] *Id.* at 375 (cleaned up).

[78] *Id.* (quoting *Branzburg v. Hayes,* 408 U.S. 665, 696 (1972)).

[79] *Id.* (quoting RESTATEMENT (FIRST) OF CONTRACTS, § 548(1) (1932)).

[80] *Id.* at 378.

[81] *In the Matter of Stein*, 483 A.2d 109 (N.J. 1984).

[82] *Id.* at 114.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.* at 116.

[87] *Id.* at 116–17.

[88] We likewise dismiss the promissory estoppel and implied covenant claims focusing on promises outside the Agreement as the four entities agreed their terms constituted the full and complete understanding as to their obligations and the alleged promise is not enforceable as contrary to a well-defined and dominant public policy.